## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-79 (BAH)** |
| **KEVIN JAMES LYONS** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kevin James Lyons to fifty-six months of incarceration, the midpoint of the Guidelines range of 51to 63 months as calculated by the government, three years of supervised release, restitution in the amount of $2,000 and a mandatory assessment of $180. A sentence at the mid-point of the Guidelines range is warranted because Lyons implicitly threatened Speaker Pelosi with violent harm when he mockingly called out her name during the riot, then entered her office in the Capitol building and stole a prized photograph, as well as the wallet of one of her staff members, and encouraged other rioters to steal personal items.

## I.    INTRODUCTION

The defendant, Kevin Lyons, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power, injured more than one hundred

police officers, and resulted in more than 2.8 million dollars in losses.[1]

Lyons, a Chicago resident, drove through the night of January 5, 2021, to arrive in Washington, D.C., for the "Stop the Steal" rally at the Ellipse on January 6. After the rally, Lyons walked to the Capitol and, despite hearing stingball bang grenades detonating around him and encountering clouds of tear gas in the air, mounted the West Front of the Capitol while stating "We're storming the Capitol building!" Lyons then entered the Capitol through the Senate Wing Door at approximately 2:20 p.m. Lyons moved throughout the Capitol complex and ultimately entered Speaker of the House Nancy Pelosi's office suites and her private office. Inside the office, Lyons took a wallet from a congressional staffer's coat and a framed photograph of the Speaker with the Civil Rights icon and former member of Congress John Lewis. Lyons left the Capitol via an Uber before travelling back to the Chicago. That night he texted some friends a picture of the stolen photograph with an admission that he took the photograph. He then bragged, "I'm pretty confident I am now a multiple Federal felon." The photograph was never recovered.

The government recommends that the Court sentence Lyons to 56 months of incarceration for his multiple convictions, including for a violation of 18 U.S.C. § 1512(c)(2), which is within the Guidelines' range of 51-63 months, which the government submits is the correct Guidelines calculation, and includes an upward departure under U.S.S.G. § 5K2.5, or, in the alternative, an appropriate upward variance pursuant to 18 U.S.C. § 3553(a). A sentence of 56 months reflects

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

the gravity of Lyons conduct but also acknowledges his acceptance of responsibility. To the extent the Court concludes that an upward departure or variance is unwarranted, the government seeks the high-end of the original guidelines range of 41 to 51 months' imprisonment.

## II.  FACTUAL BACKGROUND

### A.  The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 62, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See id*. at 27-30.

### B.  Kevin Lyons' Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Kevin Lyons, under the username @chi_hvac, took to Instagram to post a photo of the projected driving route from his home in Chicago to Washington, D.C. Lyons captioned the photo, "I refuse to tell my children that I sat back and did nothing. I'm heading to DC to STOP THE STEAL!" Lyons made the eleven-hour drive on the night of January 5, arrived

in the Washington area on the morning of January 6, 2021, and took an Uber to the Washington Monument to attend the "Stop the Steal Rally." After the rally, as the crowd began marching towards the Capitol, Lyons joined them and eventually made his way to the West Front of the Capitol. Throughout the rest of the day on January 6, 2021, Lyons video recorded on his mobile telephone his activities in Washington and at the Capitol, and the scene around him.

As Lyons reached the West Front of the Capitol, Lyons heard what he thought were flash bang grenades detonating and smelled teargas and other chemical irritants in the air. As soon as he arrived on the West Front, Lyons observed, "We're getting teargassed and flash-banged. Woop. There goes a flashbang." Rather than turning back at these clear signals that he should not have been in the area and that he was joining a riot, Lyons continued to press forward towards the Capitol and into the riot. He began to chant with the crowd: "Whose house? Our House!" and, paraphrasing the movie *Apocalypse Now*, yelled to the crowd around him, "I love the smell of teargas in the mid-afternoon." All these statements are captured on the videos that Lyons recorded that day using his cell phone.

While approaching the stairs on the West Front of the Capitol, as he watched people climbing the scaffolding that had been constructed for the Inauguration and saw still more people coughing from the chemical irritants in the air, Lyons laughingly stated, "I guess we're all going to jail." Lyons then led the crowd in a call-and-response cheer. Five times, he called "Whose house?" to the crowd, and the crowd yelled back, "Our House!" When the call and response ended, Lyons stated, "Let's take it." He then began to climb the Northwest Stairs and towards the

4

Northwest Courtyard and the Senate Wing Door.

During the entire course of January 6, Lyons maintained a glib and insolent tone in the face of the destruction, chaos, and violence of the mob. He made jokes about the situation unfolding around him, even as he saw broken bike racks, toppled security fences, shattered windows, broken doors, and overrun police officers. When he was not making light of the situation, Lyons was heckling and deriding police. While he was walking through the Northwest Courtyard in the direction of the Senate Wing Door, Lyons saw a group of United States Capitol Police (USCP) Officers who were standing outside of the Parliamentarian Door and surrounded by a mob of people who were jeering and threatening them. Upon seeing these officers, Lyons also joined in the heckling, calling out to the officers, "Fucking Nazi bastards!" and "SS!"[2].

At approximately 2:20 p.m., after yelling "Oath breakers!" to the same group of USCP officers who he had just harassed, Lyons, panning his camera to the right to capture another rioter jumping through a shattered window, entered the Capitol through the Senate Wing Door. In his self-recorded video, a security alarm can be heard blaring in the background as Lyons high-fived another rioter while crossing over the threshold. Inside of the Capitol, Lyons turned left and continued his journey into the Capitol. He continued to chant "Whose house?" and "U-S-A!" and yelled down an empty hallway: "I seek an audience with my representative!"

During his route through the Capitol, other rioters warned Lyons that he should turn back.

---

[2] During his trial, the Defendant stated that his understanding was that the SS were "essentially Nazis." The *Schutzstaffel* was an elite paramilitary unit within the Nazi Third Reich. *See* "The SS," *Holocaust Encyclopedia*, UNITED STATES HOLOCAUST MEMORIAL MUSEUM, *available at* https://encyclopedia.ushmm.org/content/en/article/ss.

One rioter told Lyons that he had encountered a line of police officers in the Crypt who were trying to prevent the mob from advancing. The rioter told Lyons and that he should turn back because it was unsafe ahead. Lyons ignored this rioter's warnings and pushed his way through the crowd in the Crypt, yelling out "Nancy, where are you?" and "Nancy!" as he went.

Lyons moved with the mass of rioters as they walked in the direction of the Small House Rotunda. While the mob was moving in towards the center of the Capitol, another rioter yelled out to the crowd, "I just got a text that there's a recess. They shut it down." In response, Lyons began to chant, "Stop the steal!" Moments later, as he walked past the office of House Majority Whip Steny Hoyer, Lyons—in the same menacing tone with which he had called out to the Speaker minutes earlier in the Crypt—called out, "Steny!"

Lyons wound his way through the Capitol for more than ten minutes before climbing a set of stairs that led to the Speaker of the House's office suites, which he reached at approximately 2:33 p.m. He took a picture of the Speaker's wooden name plate mounted over the door and posted

it to Instagram, tagging the location of the photo as being in the United States Capitol.



Lyons entered the Speaker's office suite and continued filming. At one point, he introduced himself by name to another rioter before announcing: "We are in Nancy Pelosi's office!" He then

used his cell phone to record himself in the mirror inside of the Speaker's office suite.



Inside of the office suite, Lyons saw a television playing footage of the riot from the West Front of the Capitol, where, moments before, the line of officers protecting the West Front had been overrun by rioters and forced to retreat to the Upper West Terrace and the Lower West Tunnel. Lyons reacted, "Holy shit! Is that us?" Another rioter inside of Pelosi's office, in response to seeing the television footage remarked, "They are getting ready for war." To this comment, Lyons responded, "Oh, I'm not leaving my house!" Then, as another rioter wrote a note on the back of a manilla envelope, presumptively addressed to the Speaker and her staff, Lyons cautioned him, "Watch your—uh—fingerprints." The note-writer responded, "Fuck the fingerprints. I want them to know I was here." Lyons laughed in response: "I like it. I like it." Meanwhile, the Speaker's staffers were fearfully huddled nearby in a locked office they had barricaded with furniture. *See* Joe Heim and Valerie Strauss, *As U.S. Capitol attack unfolded, some Hill staffers remember their school-shooting drills*, WASHINGTON POST, January 14, 2021, *available at* https://www.washingtonpost.com/education/hill-staffers-school-shooting-

drills/2021/01/14/3fe783d0-55e7-11eb-a931-5b162d0d033d_story.html; *see also* Rachel Scott, Mariam Khan, and Benjamin Siegel, *1 year after Jan. 6 House lawmakers tell of trauma, grief, resilience*, ABC NEWS, January 6, 2022, *available at* https://abcnews.go.com/Politics/year-jan-house-lawmakers-trauma-grief-resilience/story?id=82087924. Unsatisfied with merely entering the Capitol and the office of the Speaker of the United States House of Representatives, Lyons proceeded to collect souvenirs and to encourage others to do the same. First, he picked up a staffer's coat and yelled to the room full of rioters, "Does anyone need a coat?" He then rummaged through the pockets and pulled out a brown leather wallet which contained the owner's driver license and approximately $150 in cash. Without making any further announcements to the room about the wallet, Lyons slid it into his own pocket.

Continuing to move through the office suite into the Speaker's personal office, Lyons saw another rioter rummaging through a dish of Ghirardelli chocolates and, upon realizing that they did not have his preferred flavor, hollered out, "They got no fucking taste." He also encouraged others to take items from the Speaker's personal office and held up a pair of monogramed, pink Everlast boxing gloves and asked the crowd in the office if anyone "want[ed] Nancy's pink boxing gloves." Before leaving the Speaker's personal office, Lyons took a framed photograph of the Speaker with the late John Lewis, which Lewis had gifted to her to commemorate their last trip abroad together.   The photo almost certainly had tremendous sentimental value to Speaker Pelosi, as she had placed it on the mantel in the center of her personal office such that it was one of the first things that a person entering the office would see. For Lyons, though, the picture was merely

a souvenir of his crimes.

Lyons left the Speaker's office and moved into the Rotunda where he boasted to other rioters about how they had just breached the Speaker's office. At 2:44 p.m., while Lyons was in a hallway near the South Door, police officers deployed tear gas to disperse the rioters. Lyons yelled out, "It's Zyklon B![3] […] Nope. It's just teargas." At approximately 2:50 p.m., Lyons left the Capitol via the South Door. Lyons took an Uber from the area around the Capitol to where his car was parked. During that Uber ride, Lyons posed for a photograph with one of the souvenirs he had taken from his time in the Capitol:



That evening, at approximately 9:00 p.m., Lyons texted a group of friends. In one message,

---

[3] Zyklon B was a pesticide that was used by the SS and other agents of the Nazi Third Reich to exterminate prisoners at Auschwitz and other death camps during the Holocaust. *See* "Gassing Operations," *Holocaust Encyclopedia*, UNITED STATES HOLOCAUST MEMORIAL MUSEUM, *available at* https://encyclopedia.ushmm.org/content/ en/article/gassing-operations.

he stated, "I took this off Pelosi's fucking desk!![4] We fucking did it!!" He sent the message with a picture of the photograph. Twelve minutes later, he sent another message stating, "I'm pretty confident I am now a multiple Federal (sic) felon."

### C.      Lyons' Interview with the FBI

On January 11, 2021, the FBI agents interviewed Lyons at his home in Chicago in connection with a tip they had received about his participation in the Capitol Riot. Lyons was not taken into custody or placed under arrest and, as such, was not advised of his *Miranda* rights

Initially, Lyons confirmed to the agents that he was in Washington, D.C., on January 6, 2021, but was evasive about whether or not he entered the Capitol building. However, Lyons did assert that he could "100% guarantee without incriminating himself" that he did not see anything being damaged while he was in Washington. Lyons then began to describe "a dream he had" to the agents. In that dream, Lyons saw people banging on doors, paper being thrown, and a mob of people. Lyons further claimed that in this dream people "didn't really have much choice" of where they were going because of the mob. Leaving the dream, Lyons then told the FBI that, if he had been inside of the Capitol, it would have been for a period of approximately forty-five minutes.

The agents then confronted Lyons with a screenshot of the wooden plaque outside of the Speaker's office suite that he posted to Instagram. In response, Lyons said, "Wow. You guys are pretty good. That was only up for an hour." However, Lyons then contradicted himself and said, "I can't guarantee that I posted it." When one of the agents asked Lyons if he still had the picture

---

[4] The photograph of the Speaker and Representative Lewis was on the mantle in her office, not on her desk. It appears Lyons embellished the story about the theft to his friends to make his actions more impressive.

on his phone, Lyons confirmed that he did and then showed the agents the same picture that he had posted to Instagram. Lyons then showed the agents a second picture of the plaque and a video that he took inside of the Capitol, which showed a crowd of people walking through the building. Lyons later offered to provide these photos and videos to the FBI.

When the agents inquired about what Lyons wore at the Capitol, he said that he wore two hooded sweatshirts and a blue camouflage print neck gaiter. Upon confirming that he still had the clothes, Lyons agreed to put them on so that the agents could photograph him wearing the clothes.

Lyons then provided a narrative about his activities in the Capitol, and how he came to be in Washington that day. According to Lyons, the purpose of his trip to Washington was to attend the former president's rally on the morning of January 6. Lyons described himself as a "tourist" in Washington and said that he live-streamed his experience. Lyons further asserted that he been present at a number of "back the blue" rallies to show his support for law enforcement officers, including one in Kenosha, Wisconsin, which was also hosted by the former president.

Prior to taking the Uber to Washington Monument, Lyons tried to put on a Kevlar ballistic vest but was unable to fit it over his sweatshirts. Lyons said that he wanted to wear the vest because it "looks cool." Lyons denied taking any firearms or weapons with him to Washington, stating, "No, no, no, I am an Illinois guy."

Lyons informed the FBI agents that the rally was the only event he had planned on attending in Washington that day and that he only started to move to the Capitol when the crowd started moving that way. Lyons reported that, while marching down Pennsylvania Avenue to the Capitol, he heard what he thought were flash bang grenades detonating and people walking back

towards him away from the Capitol with "red faces." Lyons claimed that the crowd continued to move to the Capitol and that there was "very little he could do to escape" because of his size.

Lyons stated that, once he arrived at the Capitol, he saw people tearing up scaffolding and climbing the walls of the building. Lyons then confirmed that he climbed the stairs to the Capitol and entered the building through a door. Inside of the building, Lyons stated, he walked to the Rotunda and looked at statues while getting his bearings. Lyons reported that he then climbed a staircase to the second floor of the building. Lyons admitted he went to the "big boss' office," who he confirmed was Speaker Pelosi.

Lyons also confirmed that, prior to entering the Speaker's office, he took a photo of the plaque outside her office and posted it to Instagram. Lyons then stated that he left the Speaker's office when a police officer entered with a gun drawn and ordered everyone to leave. Lyons then said that he walked down a flight of stairs, encountered a hallway that was full of tear gas and heavily armed officers, and then left the building.

Lyons claimed that he did not damage anything inside of the Capitol and that he did not witness any violence. Lyons further claimed that he would have intervened to stop any violence that he personally witnessed and would not have permitted anyone to get hurt. Lyons also told a story of assisting a police officer who the crowd cornered.[5] Lyons then remarked that he "did not know what would have happened" if the mob had found Speaker Pelosi or Vice President Pence.

Lyons did not mention anything in his interview with the FBI about stealing the photograph

---

[5] Undersigned counsel has not observed anything on the Capitol CCV footage to support this claim.

or the wallet from the Speaker's Office. Later that night, Lyons sent the FBI case agent an email with three links to YouTube videos, each of which depicted Lyons' participation in the riot at the United States Capitol.

### III.    THE CHARGES AND STIPULATED TRIAL

On January 13, 2021, Lyons was arrested on a criminal complaint charging him with violations of 18 U.S.C. § 1752(a)(1) and 40 U.S.C. 5104(e)(2)(C) and (D). On June 9, 2021, the grand jury returned an indictment against Lyons, charging him with violations of 18 U.S.C. § 1752(a)(1) and (2), 40 U.S.C. § 5104(e)(2)(C), (D), and (G), and 18 U.S.C. 1512(c)(2), 2. On April 7, 2023, this Court convicted Lyons of all of charges as the result of a stipulated trial.

### IV.    STATUTORY PENALTIES

Lyons now faces sentencing on all the charges in the superseding indictment. As noted by the Presentence Report issued by the U.S. Probation Office, Lyons faces a maximum sentence of one year' incarceration, not more than one year of supervised release, and a mandatory assessment of $25 each for Counts One and Two, a maximum of six months' incarceration and a mandatory assessment of $10 each for Counts Three, Four, and Five, and a maximum of twenty years' imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100 for Count Six.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

be the starting point and the initial benchmark" for determining a sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Respectfully, the draft PSR includes an error. It fails to include the eight-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B) for causing or threatening to cause physical injury to a person or damage to property in order to obstruct justice. *See* PSR ¶¶ 50-58. Lyons, knowing that an official proceeding was under way in the United States Capitol on January 6, 2021, and that the Speaker of the House would play a key role in that proceeding, entered the Capitol as a member of a riotous mob.   He went directly to the office of the Speaker while calling out her name in a menacing tone. In the context of the actions of the riotous mob, some of whom were baying for blood, Lyons' invocation of the Speaker's name could only be intended and understood as a threat of violence.

Lyons' threats extended to the Speaker's property and that of her staff. While he was in the Speaker's office, Lyons repeatedly goaded other rioters to take the personal property that was in the office. Lyons himself stole two items from the office, the photograph and wallet. Lyons earned the U.S.S.G. § 2J1.2(b)(1)(B) enhancement when he implicitly but clearly threatened the Speaker with physical injury and expressly damaged property by stealing it. *See*, *e.g.*, *United States v. Bledsoe*, 21-cr-204 (BAH), Government's Sentencing Memorandum (applying § 2J1.2(b)(1)(B) for choosing not to leave when the mob around Bledsoe started calling out for the Speaker by name even though Bledsoe did not personally call for the Speaker or threaten any specific person.).

15

The appropriate offense level computations for Counts One, Two and Six before any grouping analysis under Part D of Chapter 3 or any credit for acceptance of responsibility are:

**Count One: 18 U.S.C. § 1752(a)(1) - Entering and Remaining in a Restricted Building or Grounds**

| | | |
|---|---|---|
| Base Offense Level | 4 | U.S.S.G. §2B2.3(a) |
| Specific Offense Characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |
| Cross Reference | | U.S.S.G. §2B2.3(c)(1) ("If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that felony offense, if the resulting offense level is greater than that determined above.")<br><br>Lyons committed the trespass offense charged in Count One with the intent to commit the felony offense of obstruction of a proceeding before Congress, in violation of 18 U.S.C. § 1512(c)(2), charged in Count Six. |
| Base Offense Level (adjusted) | 25 (from Count Six) | U.S.S.G. § 2X1.1(a): "the base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." |
| Total | 27 | |

**Count Two: 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
| Total | 10 | |

**Count Six: 18 U.S.C. § 1512(c)(2) and § 2 - Obstruction of an Official Proceeding Before Congress, and Aiding and Abetting**

| | | |
|---|---|---|
| Base offense level: | 14 | U.S.S.G. §2J1.2 (a) |
| Special Offense Characteristic | +8 | U.S.S.G. §2J1.2 (b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of |

| | | |
|---|---|---|
| | | justice." |
| Special Offense Characteristic | +3 | U.S.S.G. §2J1.2 (b)(2): "the offense resulted in substantial interference with the administration of justice." |
| Total | 25 | |

Because the victim of all three of these offenses is Congress, they form a single "group." U.S.S.G. § 3D1.2(a) and (b). The offense level for the group is 25. U.S.S.G. § 3D1.3. Because Lyons waived his right to a jury trial and agreed to be tried on the basis of stipulated evidence, the government does not oppose a three-level downward adjustment for acceptance of responsibility, under U.S.S.G. § 3E1.1(a) and (b), yielding an offense level of 22. The U.S. Probation Office calculated Lyons's criminal history as category I, which is not disputed. PSR ¶ 60-61. Accordingly, with any additional variances or departures, the appropriate range is 41 to 51 months.

On July 2 ,2023, the Court notified the parties pursuant to Fed. R. Crim. P. 32(h) that it was contemplating an upward departure under U.S.S.G. § 5K2.5, which permits such an upward departure "if the offense caused property damage or loss not taken into account within the guidelines." *Burns v. United States*, 501 U.S. 129, 138-39 (1991). The government has determined that this departure applies and accordingly advocates for a moderate two-point increase. *See United States v. Erpenbeck*, 532 F.2d 423, 440-441 (6th Cir. 2008) (applying § 5K2.5 in a financial fraud sentencing where "several hundred people suffered 'the devastating effect that the unraveling of [the defendant's] scheme had" because the defendant "knowingly risked great financial and emotional harm to the homeowners and that this harm was not properly taken into account under the Guidelines."); *see also United States v. Love*, 2023 WL 3243991, *2 (9th Cir. 2023) (finding that the district court did not abuse its discretion by applying a two-level departure under § 5K2.5

because "the property damage involved was 'to a degree not adequately taken into consideration in the guidelines.'" (*citing* U.S.S.G § 5k2.0 cmt. n.3(B)(i)); *United States v. Luppold*, 259 Fed.Appx. 560 (4th Cir. 2007) (upholding a two-point upward departure under § 5K2.5 in a trafficking of stolen goods case to account for the "non-monetary harm caused by [the defendant's] offense.") Here, during an unprecedented riot, Lyons stole a photograph from the Speaker of the United States House of Representatives and a wallet from one of her staff members as rioters rummaged through her personal office and suite. At the time that he stole these items, the Speaker had been evacuated to a secure location and her staff was sheltering in place across the hall hearing rioters bang on the doors and call out threats. The government does not seek a departure based on the theft of the wallet, but on the non-monetary and irreplaceable characteristics of the stolen photograph.

The picture that Lyons stole from the Speaker had been given to her by Representative John Lewis and showed the two of them on their final trip abroad together. As the Court is aware, Representative Lewis was one of the most celebrated heroes of the Civil Rights Movement. *See* Branch, Taylor, PARTING THE WATERS, AMERICA IN THE KING YEARS, 1954-63. Subsequent to his time in the Civil Rights Movement, Representative Lewis spent more than two decades serving in the House of Representatives for the State of Georgia until his death on July 17, 2020. The monetary value of this framed photograph is dramatically outweighed by its evident sentimental value, as demonstrated by its prominent and central place in the Speaker's personal office. Therefore, since the photograph had a non-monetary value, Lyons theft and subsequent disposal

of it is plainly "property damage or loss not taken into account within the guidelines."[6] U.S.S.G. § 5K2.5; *see also United States v. Spiegelman*, 4 F. Supp. 2d 275, 275-279 (S.D.N.Y. 1998) (Kaplan, J.) (applying a five-level upward departure under § 5K2.5 for a defendant convicted of stealing "hundreds of rare manuscripts and documents from the library of Columbia University" valued by joint stipulation at $1.3 million but whose "theft had an impact different in kind from a loss of money or other easily replaceable property, for these materials have value to the Columbia academic community and other scholars and, through them, to society at large that cannot be measured in economic terms alone.").[7] Lyons bragged about his theft to his friends and then

_____

[6] Lyons was not charged with the theft of the photograph, there is no "loss amount" derived from the market value of the photograph that would apply, for instance, had Lyons been convicted of theft under 18 U.S.C. § 641 and U.S.S.G. § 2B1.1 applied. Second, although the government seeks an enhancement under U.S.S.G. § 2J1.2(b)(1)(B) because "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," that enhancement would apply regardless of whether Lyons caused "property damage." Rather, Lyons' implicit but unmistakable threats against Speaker Pelosi were sufficient to show that he "threatened to cause physical injury to a person" and thus support the § 2J1.2(b)(1)(B) enhancement.

[7] Judge Kaplan granted the departure in this *Spiegelman* following a *Fatico* hearing at which experts testified that the stolen items had incalculable value beyond their market value. As one of the experts testified at the *Fatico* hearing, the "very existence of rare books and manuscripts provides the basis for new discovery and interpretation in almost every area of study and can continue to do so only for as long as these treasures remain preserved and protected." *Id.* That such value could not calculated by market analysis supported application of the enhancement. "[B]y taking raw materials of importance to scholars and the academic community, Spiegelman knowingly risked causing substantial harm of a kind which is inherently unknowable, unquantifiable, and substantially non-monetary in character." *Id.* at 280. That copies of many of the stolen items existed did not render the departure inappropriate. "The utility of a copy in such a case depends upon the extent to which the copy reproduces the relevant characteristics of the original. The evidence at the *Fatico* hearing convincingly established that photocopies of a substantial part of the stolen material, even if they existed, would be inadequate because of their inability to reproduce physical and other characteristics of the originals[.]" *Id.* at 281-282.

destroyed or otherwise disposed of the photograph, as it has never been recovered despite a search of his home. That these thefts occurred while the rightful owners of the property had either been evacuated or forced to hide from a mob increases the harm of the thefts.

Finally, by stealing the photograph of Speaker Pelosi and a man whose face was instantly recognizable to millions of Americans, Lyons "intended or knowingly risked" harm to Speaker Pelosi, and that such "harm [was] more serious than other harm caused or risked by the conduct relevant to the offense of conviction." U.S.S.G. § 5K2.5. After all, just a casual review of the hundreds of January 6 cases prosecuted in this Court shows that only a few involved the theft of personal items from the offices of Members of Congress, Senators, or their staff, and of those, few if any involved an item of such obvious and substantial non-monetary value. Moreover, while the defendant has accepted the consequences of his actions, he has never truly showcased any remorse, particularly related to the theft.

With the two-level increase under § 5K2.5, the final offense level is 24 and the applicable guidelines range to 51 to 63 months. The government believes that a mid-point sentence of 56 months, three years of supervised release, restitution in the amount of $2,000 and a mandatory assessment of $180. At the very least, the Defendant should not serve less than fifty-one months of incarceration for his numerous offenses during the January 6 Capitol Riot. While the government believes § 5K2.5 applies, we request that should the Court depart upward, it also note that this increase is warranted under § 3553(a) factors set forth by Congress.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court

must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A. Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Lyons' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The attack on the Capitol was a norm shattering event that, by its very nature, defies comparison to other events in American history much less isolated instances of criminal behavior by individuals.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances and their conduct directly contributed to those circumstances. As a person entered the Capitol, they would—at a minimum—have passed numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

21

The nature and circumstances of this defendant's crimes weigh heavily in favor of a significant term of incarceration. Lyons drove through the night to be in D.C. on the morning of January 6 and, after attending the former president's rally at the Ellipse, walked to the Capitol with the mob while leading cheers. At the Capitol, he freely and happily walked into a riot and ultimately followed the rioters into the building itself and the personal office of the Speaker of the House of Representatives. Prior to entering the Speaker's office, Lyons called out to her multiple times in a manner indicating his ill intent should he and the mob encounter her. Inside of the Speaker's office, he stole two items of personal property, including one of immeasurable value because it depicted the Speaker and the late-Representative Lewis on their last trip abroad together.

Lyons also repeatedly made light of the events, including multiple repulsive references to the Nazi regime and the Holocaust, which he consistently directed at police officers who were protecting the Capitol Building, the lawmakers and staffers inside of it, and the democratic process in operation on that day. The nature and circumstances of Lyons' offenses were of the utmost seriousness, and fully support the government's recommended sentence of 56 months of incarceration, at the midpoint of the advisory Guidelines range.

**B.  Lyons' History and Characteristics**

Lyons has no criminal convictions but has been arrested twice. When he was 17, Lyons was arrested in Chicago for assault but the case was ultimately dismissed. In 2014, when Lyons was 34, he was arrested for obstructing an officer but the case this case was also dismissed.

Lyons' history and characteristics separately support a term of incarceration. When Lyons was first interviewed by the FBI agents, he evaded the question about whether he entered the

Capitol. Instead, seemingly answering the question that he wished had been answered, said that he could "100% guarantee that he didn't see anything being damaged."[8] When the FBI agents showed Lyons a photograph that he had posted to Instagram that had been taken inside of the Capitol, he acknowledged that he had deleted it from his Instagram after an hour and thus admitted to the destruction of some of the evidence against him. Finally, the photograph that Lyons stole from the Speaker's personal office has never been recovered despite the FBI searching Lyons' home, meaning that he has either destroyed it, disposed of it, or continues to possess it to this day. These actions support a term of incarceration at the top of the advisory Guidelines range.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law.

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Kevin Lyons' conduct on January 6 was the epitome of disrespect for the law. When Lyons climbed the Northwest Stairs and ultimately entered the Capitol, it was clear that the barricades and police officers who had been protecting the building had been overwhelmed and overrun. Lyons took advantage of this situation to enter the Capitol after extolling the crowd, "We're storming the Capitol!" After entering the building under these circumstances, Lyons eagerly paraded around, filming himself as he cracked jokes about Nazis, reveled at the sight of a television that was broadcasting the riot live, and engaged in theft inside of the Speaker of the House's Office. Lyons, as a member of that mob, was not merely disrespecting the law, he was an

---

[8] This statement was untrue. Lyons' videos captured damage to the scaffolding of the Inaugural Stage, damage to the windows around the Senate Wing Door, and damage to a mirror in the Speaker's personal office. This is to say nothing of the damage that he almost certainly witnessed but did not capture in his recordings.

active participant in an attack on the bedrock principle of our republic: the peaceful transition of power between democratically elected commanders-in-chief. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant weighs heavily in favor of a term of incarceration at the top of the applicable Guidelines range. Lyons's attitude both on January 6 and in the months and years following it demonstrate the need for specific deterrence. As noted above, throughout the day on January 6, Lyons maintained an insolent and jovial tone. Lyons's acts on January 6 and his bizarre early efforts to deter the investigation demonstrate that he is not remorseful for what he did but is instead remorseful that

---

[9] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

24

he now must bear the consequences of his actions. The sentence should provide specific deterrence to Lyons. This factor weighs heavily in favor of a sentence at the top of the Guidelines range.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United*

*States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier

26

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[11]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Bledsoe*, 21-cr-204 (BAH), the defendant scaled a wall to access the Capitol via the Senate Wing Door. Once inside of the building, Bledsoe declared "We in this bitch!" and then started calling out "Nancy!" as he moved through the Capitol with the mob for twenty-two minutes. Following a jury trial, Bledsoe was convicted of violating 18 U.S.C.

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

§ 1512(c)(2), 18 U.S.C. § 1752(a)(1) and (2), and 40 U.S.C. § 5104(e)(2)(D) and (G). This Court sentenced the Defendant to 48 months' incarceration.

In *United States v. Hale-Cusanelli*, 21-CR-37 (TNM), the defendant was one of the first rioters to breach the building via the Senate Wing Door, remained in the building for forty minutes, and made multiple derogatory comments towards the police officers who stood in his way. Following a jury trial, Hale-Cusanelli was convicted of violating 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 1752(a)(1) and (2), and 40 U.S.C. § 5104(e)(2)(D) and (G). Judge McFadden sentenced Hale-Cusanelli to 48 months' incarceration.

The facts of both these cases are closely analogous to the facts of Lyons' case. All of the defendants were convicted of 18 U.S.C. § 1512(c)(2), all of them entered the Capitol through the Senate Wing Door and remained in the Capitol for less than an hour, both Hale-Cusanelli and Lyons harassed police officers, and both Bledsoe and Lyons called out in a threatening manner to the Speaker of the House. Nonetheless, Lyons' conduct on January 6, 2021, was, in fact, more serious than both Hale Cusanelli and Bledsoe because Lyons entered the Speaker's personal office and stole personal property within it. Both Hale-Cusanelli and Bledsoe received the eight-point enhancement for threatening injury to person or property to obstruct justice and the three point enhancement for obstruction of justice.[12] In this case, both enhancements are equally applicable

---

[12] In both *Hale-Cusanelli* and *Bledsoe*, the defendants proceeded to trial and did not receive credit for acceptance of responsibility. Because Lyons swore to the truth of the facts contained in the statement of offense in this case, ECF 79, the government believes that Lyons does deserve credit for acceptance of responsibility. Additionally, although he engaged in obstructive conduct early in this case and that conduct should be considered in determining his sentence length for purposes of specifically deterring him from engaging in this type of behavior, the government does not believe that Lyons' obstructive conduct rose to the level meriting an enhancement under U.S.S.G. § 3C1.1.

because of Lyons' menacing conduct in the Capitol toward the Speaker of the House and the Majority Leader and his efforts to impede the investigation. While no one case is a perfect analogy, the defendant's intent and actions on the date of the crime, coupled with his behavior afterwards, militates in favor of at least a high-end sentence.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Lyons was convicted of violating, *inter alia*, 18 U.S.C. § 1752(a)(1), which is "an offense against property" insofar as that

trespass offense deprived Vice-President Pence, United States Senators, and members of Congress their rights to occupy the Capitol building during their constitutionally mandated duties to certify the Electoral College vote. As such, the MVRA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total

losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Lyons to pay $2,000 in restitution for his convictions.   That amount fairly reflects Lyons' role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity. Although one cannot overstate the seriousness of the defendant's theft on that day, we do not seek restitution for the photograph or the wallet, rather couching our request for an enhanced sentence of incarceration to account for such personalized losses.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of fifty-six e months of incarceration, three years of supervised release, restitution in the amount of $2,000, and a mandatory assessment of $180.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     *s/ Sean P. McCauley*
SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D. Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov

MICHAEL J. ROMANO
Trial Attorney, Detailee
Illinois Bar No. 6293658
601 D. Street NW
Washington, DC 20530
Michael.Romano2@usdoj.gov